FILED
U.S. D[ ]  [ ] COURT
DIST  ICT OF WYOMING

2012 MAY 10  PM 2 45

STEPHAN HARRIS, CLERK
CHEYENNE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* HOSPITALITY MANAGEMENT, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>PINNACLE BANK,<br>Defendant. | ) **RELATOR'S COMPLAINT**<br>) **PURSUANT TO THE FEDERAL**<br>) **FALSE CLAIMS ACT, 31 U.S.C.**<br>) **§§3729 *Et Seq.***<br>)<br>) **FILED UNDER SEAL**<br>)<br>) **DO NOT PLACE ON PACER**<br>)<br>) **DO NOT PLACE IN PRESS BOX**<br>)<br>) **CIVIL ACTION NO.** 12-CV-95-F |

**COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *Et Seq.***

**I.    INTRODUCTION**

1.    Hospitality Management, Inc. ("Relator" or "HMI"), on behalf of the United States and its agency the Small Business Administration ("SBA"), brings this action against Pinnacle Bank ("Pinnacle" or the "Bank") for violations of the federal False Claims Act ("False Claims Act" or "FCA") to recover all damages, civil penalties and all other recoveries provided for under the False Claims Act.

2.    This action arises out of and seeks remedies for Pinnacle's conduct consisting of withholding material information from the SBA and making materially false statements to the SBA with regard to the funding of an SBA "504" loan (13 C.F.R. §§ 120.800-120.991) in the sum of $2,000,000 for Columbine Group, LLC ("Columbine"), a Wyoming limited liability

1

company. The 504 loan was to be processed by Frontier Certified Development Company ("Frontier"), a non-profit corporation, which was certified by the SBA to service and close 504 loans and act as agent for SBA.

3. In 2007, the Bank arranged a financing package to fund the construction of a $5.6 million hotel project in Laramie, Wyoming. The project was owned by the Columbine, which was, in turn, owned by Samuel Tilden ("Tilden"). Mr. Tilden also owns the Relator, HMI. The financing package required the Bank to provide up to $4.8 million in interim construction financing in 2007 which, in 2008, would be converted to a permanent financing package. The permanent financing package involved the Bank obtaining a first mortgage for up to $2.8 million with the other $2 million to be funded with a "504" debenture as a second mortgage. In essence, Pinnacle would assign $2 million of the Columbine's debt to SBA for which it would receive a payment of $1.945 million in SBA "504" funds.

4. At the time for conversion to permanent financing in December of 2008, the Bank made material misrepresentations to SBA. It also concealed from SBA facts that the Bank was bound to disclose. It made such misrepresentations and concealed such facts in order to obtain the $1.945 million payment from the SBA. Specifically, the Bank misrepresented and concealed that: (a) the Bank believed that Columbine/Tilden had exhausted all credit resources by October of 2008; (b) the Bank believed Tilden and Columbine had suffered material changes in financial condition; (c) the Bank had internally decided that Tilden/Columbine were in default on the construction financing such that the Bank would not convert its portion of the loans to permanent financing; (d) the Bank had concluded the existing mortgage security would be insufficient to

2

secure the SBA's mortgage; and (e) the Bank had taken actions to protect itself by increasing its mortgage security at the expense of the SBA.

5.    After inducing SBA to pay it the $1.945 million, the Bank then forced Tilden and Columbine into Bankruptcy reorganizations. Under the Bankruptcy plans, SBA will recover only a small portion of the $1.945 million (plus interest) that the SBA was induced to pay Defendant. The direct and proximate result of the Bank's concealments and misrepresentations was substantial losses to the SBA in excess of $2 million for principle and interest. These allegations are more particularly detailed below.

## II.    THE PARTIES

6.    The United States is a plaintiff to this action. The United States brings this action on behalf of itself and on behalf of its agency, the United States Small Business Administration.

7.    Defendant Pinnacle Bank offers a range of banking services, including online banking, loans and accounts, and serves a broad range of commercial, individual and agricultural customers. Pinnacle Bank has over 115 branches in eight states throughout the United States, including a branch located at 1702 Sheridan Avenue, Cody, Wyoming 82414-0218.

8.    The Relator, HMI, is a Wyoming S-Corporation wholly owned by Sam Tilden ("Tilden"). Mr. Tilden owns Columbine, which is a Wyoming limited liability company formed to construct and own a hotel in Laramie, Wyoming, known as the AmericInn Lodge and Suites (referred to herein as the "Hotel" or the "AmericInn"). Under a written agreement with Columbine, HMI manages the business operations for the Hotel.

9.     Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1). Relator brings this action on behalf of the United States for violations of the Federal False Claims Act.

10.    Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

## III.    JURISDICTION AND VENUE

11.    Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 *et seq*., specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.

12.    Venue in the District of Wyoming is appropriate under 31 U.S.C. § 3732(a) in that, at all times material to this civil action, the defendant transacted business in the District of Wyoming or submitted or caused the submission of false claims in the District of Wyoming.

## IV.    THE FALSE CLAIMS ACT

13.    The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(l)(A)-(B).

4

14.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(l)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(l)(B).

15.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded .... " 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

16.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## V.     SMALL BUSINESS ASSOCIATION 504 LOAN PROGRAM

17.     The SBA's 504 Loan Program offers small-businesses long-term, fixed-rate financing to acquire major fixed assets for expansion or modernization.

18.     A Certified Development Company ("CDC") is a nonprofit corporation certified by the SBA that generates, closes, and services 504 loans. In this case, the Certified Development Company for SBA in Wyoming was Frontier CDC.

5

19.     Financing of 504 projects typically consists of (1) a contribution from the borrower covering approximately 10 percent of the project costs; (2) a loan obtained from a CDC and assigned to the SBA, covering approximately 40 percent of the project costs and certain administrative costs, collateralized by a second lien on the project property; and (3) a loan secured from a private sector lender covering the remainder of the project costs (approximately 50 percent) and collateralized by a first lien on the project property. 13 C.F.R. § 120.801, § 120.900.

20.     In general, a borrower applies for 504 financing through a CDC. If the SBA approves the loan application, the SBA issues a loan authorization agreeing to guarantee part of the financing for the project if certain conditions are met. After the loan authorization, projects usually require interim financing before the completion of the 504 project. This interim financing is often provided by the same private sector lender that provides a portion of the permanent financing. Once the 504 project is completed, the CDC is responsible for closing the 504 loan. If all the requirements of the loan authorization are met, the loan is bundled with other loans and sold on the public market as a debenture. The debenture is guaranteed 100 percent by the SBA with the full faith and credit of the United States. Proceeds from the sale of the debenture fund the 504 loan and pay off the interim loan.

21.     Before the 504 loan closing, the interim lender, the borrower, and the CDC must certify that since the date of the loan application, there has been no unremedied substantial adverse change in the borrower's financial condition or ability to repay the 504 loan. 13 C.F.R. § 120.892.

22.     The SBA may decline to close the debenture, direct the transfer of the 504 loan to another CDC, or cancel its guarantee of the debenture prior to sale if the CDC, third party lender, or the borrower failed to disclose or misrepresented a material fact to the SBA regarding the project or the 504 loan, or if the SBA determines that there has been an unremedied material adverse change since the 504 loan was approved. 13 C.F.R. § 120.960.

## VI.     STATEMENT OF FACTS

### A.     AmericInn Lodge and Suites Financing

23.     In 2006, Tilden, for Columbine negotiated with Pinnacle to obtain financing for an AmericInn Lodge and Suites to be located on East Grand Avenue in Laramie, Wyoming, situated 1.6 miles from the University of Wyoming stadium and the site of the new University of Wyoming sponsored convention center. The AmericInn would consist of a three story hotel located on 2.53 acres with 59 rooms including approximately 11 suites with a fireplace, spa or both. The AmericInn's amenities would include: a pool, changing rooms, hot tub, large breakfast dining area, business center, meeting rooms and fitness center.

24.     Pinnacle determined that it would fund the AmericInn if the total costs, exclusive of interest on any loans, would not exceed $5.6 million.

25.     By October 27, 2006, Pinnacle and Tilden/Columbine agreed to a loan package and structure to finance the AmericInn. This agreed proposal contemplated that the construction financing in the sum of $4.8 million would be converted to long-term permanent financing with part of the permanent funding coming from the SBA 504 Loan. The amount to be funded was determined by adding the costs for acquiring the land, completing construction according to an

7

approved design, and furnishing the Hotel. The total costs, exclusive of interest on any loans, were determined to be $5.6 million.

26.     The financing package agreed to by the parties had the following principal components:

a.  Tilden/Columbine would contribute approximately $843,000 or 15% of the projected costs as its equity. This requirement would be utilized to pay for acquiring the land, project design, planning, zoning, permits, and other development costs. Columbine would also be responsible for covering construction cost over-runs.

b.  Pinnacle would allow Tilden to personally borrow up to $500,000 of this equity requirement through a Home Equity Line of Credit ("HELOC") secured by a mortgage on his personal residence in Cody, Wyoming. Pinnacle stated that there was substantial additional equity in the residence and Pinnacle stated it would increase the HELOC as needed. Pinnacle required that Tilden personally guarantee the loans to Columbine.

c.  For the estimated $4.8 million in construction costs, Pinnacle would loan that amount to Columbine through a short term note secured by a mortgage on the property. The SBA termed this amount as the "Interim Financing." (It will also be referred to herein as the "Construction Financing.")

d.  When the Hotel was substantially completed and open for business, the short-term Interim Financing would be replaced by Permanent Financing. The Permanent

Financing would consist of two parts: A twenty-year first mortgage in favor of

Pinnacle for the amount of $2.797 million would be secured by a first mortgage

on the property; and (2) A twenty-year second mortgage in favor of Frontier/SBA

in the amount of $2 million. Practically speaking, Frontier/SBA would pay $1.945

million to Pinnacle to acquire $2 million of debt owed by Columbine.

27.     Tilden and Columbine made full disclosure of their financial resources to

Pinnacle. At all times, Pinnacle knew Tilden's and Columbine's financial resources were fully

committed. They knew that Tilden's and Columbine's resources would be dependent upon the

availability of credit in the Construction Financing and the HELOC to carry them through the

initial year of operations of the Hotel after completion. Pinnacle knew that they did not have and

would not have any additional financial resources available to them apart from Tilden's personal

real estate holdings and the revenues produced by the Hotel once it began operations. All

representations of financial condition and planning by Tilden and Columbine reflected those

facts.

28.     On October 27, 2006, Schumacher sent a letter to Frontier. The letter to Frontier

stated that Pinnacle agreed to a construction loan for the AmericInn of approximately $4.8

million at a 7% interest rate ("Construction Loan"). Upon completion of the construction of the

hotel Pinnacle agreed that it would: (a) provide a permanent first mortgage of up to

approximately $2.8 million at an interest rate of the 1 or 5 year Treasury Bond index at the time

plus 2.45% ("Permanent Loan" or "Permanent Financing") and would accept $1.945 million

from SBA in return for assigning it $2 million of the construction debt owed by Columbine,

9

secured by a second mortgage. Below is a summary of the terms set forth in the letter to Frontier:

| Lender | Loan Amount | Rate | Terms | Monthly Payments | Annual Debt Service |
|--------|-------------|------|-------|-----------------|---------------------|
| SBA 504 | $2,000,000 (35%) | 7.0% | 20 Yrs | $15,505.97 | $186,071.64 |
| Pinnacle | $2,797,500 (50%) | 7.25% (First year) 1/5 year Treasury +2.45% adjusted annually | 20 Yrs | $22,110.76 | $265,329.76 |
| Tilden | $843,075 (15%) | | | | |
| TOTAL | $5,640,575 | | | $37,616.73 | $451,401.40 |

29.     On December 5, 2006, the SBA sent Pinnacle and Columbine an "Authorization for Debenture Guarantee" ("Authorization"). In this Authorization, SBA agreed that it would provide a guaranteed 20 year Debenture in the amount of $2 million from which it would pay Pinnacle $1.945 million and receive a $2 million second mortgage on Columbine's property at the time of conversion of the Construction Financing to Permanent Financing.

30.     The SBA/Frontier's agreement in the Authorization was expressly conditioned upon Pinnacle complying with certain terms. Among those terms and conditions was that Pinnacle would provide the $4.8 million in construction financing after which Pinnacle would commit to converting to Permanent Financing with a $2.797 million first mortgage, would accept a $1.945 million payment from SBA 504 funds in return for assigning to SBA $2 million of Columbine's construction. Under ¶ B.3(a) on page 3, the Authorization stated, in pertinent part, under the heading of "Permanent Financing" that:

Pinnacle Bank, Cody ("Third Party Lender") will provide permanent project financing in the amount of $2,797,500.00 ("Third Party Lender Loan").

The Authorization further provided that Pinnacle would comply with the following which was

set forth in ¶ A.2(c) of the Authorization:

**Required Certifications Before 504 Loan Closing:** Following completion of the
Project, CDC must cause Interim Lender to certify the amount of the interim loan
disbursed, that the interim loan has been disbursed in reasonable compliance with
this Authorization, and that it has no knowledge of any unremedied substantial
adverse change in the condition of the Borrower since the date of the loan
application to the Interim Lender.

Additionally, ¶ D.1.c. of the Authorization specified:

c. CDC must obtain from prior lienholders *[i.e., Pinnacle]* written verification (1)
of amount owing on prior obligation, (2) that Borrower is current on payments,
and (3) that Borrower is not otherwise in default.

31.    Pinnacle then sent Tilden/Columbine a Final Loan Commitment Letter of Terms

and Conditions ("Commitment Letter") on April 19, 2007, which confirmed the proposed loan

structure and pricing.

32.    Pinnacle's Commitment Letter stated that the interest on the Construction Loan

would be rolled into the Permanent Loan at closing. This was a significant factor in Tilden's

decision to go forward with the construction of the AmericInn. The Commitment Letter

specifically stated:

Interest payments monthly on the Construction Loan, calculated on a simple
interest basis on the daily outstanding balance for the monthly billing period,
along with all principal at maturity to be refinanced into a term loan to be further
defined below.

33.    Pinnacle's Commitment Letter also stated that the interest rate of 7.5% on the

Construction Loan would change upon conversion to the Permanent Loan, specifically it stated:

> Pinnacle Bank commits to indexing the rate on its permanent term financing
> portion at your choice of either the 1 year or 5 year U.S. Treasury Bond Index
> (Constant Maturity Index, or CMT) in effect at the time of the permanent loan
> funding plus 2.45%, that rate to be adjusted annually at the anniversary of the
> permanent loan closing using the same index chosen at the permanent loan
> closing.

34.     The Commitment Letter further stated that Frontier required a 10% contingency reserve of building construction costs. This reserve would be provided through a loan commitment of up to $500,000 to be secured by Tilden's personal home in the form of a HELOC.

35.     On April 20, 2007, Tilden, Columbine and Pinnacle executed documents implementing the terms of the Commitment Letter. These documents were the Construction Financing documents, including the promissory notes, mortgages, and Tilden's personal guaranty of Columbine's debts to Pinnacle. The parties also executed the consents of Columbine and Pinnacle to the terms and conditions of the Authorization dated December 5, 2006. These consents contractually obligated Pinnacle to perform as described above in Paragraph 30 of this Complaint.

36.     Tilden and Columbine then proceeded with the AmericInn by acquiring the land and commencing construction.

37.     The AmericInn was substantially complete and ready for occupancy by January of 2008. A certificate of occupancy was issued to Columbine on February 8, 2008. The Hotel opened for business later that month.

12

38.     At that point in time, Tilden and Columbine understood and reasonably believed that the construction costs had come to approximately $4.56 million and that the final punch lists and remaining finishing works would be within the $4.8 million of the Construction Loan. They likewise reasonably believed that, upon conversion to the Permanent Loan, Mr. Tilden would have $350,000 in credit available from the HELOC which could be used to cover shortfalls of operating revenues which would likely occur in the initial year of operation of the start-up business.

39.     On or about February of 2008, however, Schumacher, acting for Pinnacle, concluded that the anticipated pecuniary benefits for Pinnacle in the transaction were at risk of not being realized if the Permanent Loan replaced the Construction Loan at that time. Specifically, Schumacher knew:

a. The loan documents specified that the interest rate for Pinnacle on the Permanent Loan was to be 2.45% over the rate for certain U.S. Treasury funds. In April of 2007, Pinnacle had projected that it would be receiving interest at 7.25% on its portion of the Permanent Loan, which was only slightly less than the 7.5% rate on the Construction Loan. By February of 2008, however, the U.S. Treasury rates had declined and were continuing to decline. Had Pinnacle converted to the Permanent Loan at that point, the permanent interest rate for Pinnacle's loans would have been reduced to approximately 4%.

b. The national economic recession was deepening which gave Schumacher concerns about the short term viability of the AmericInn and its future market

> value. Schumacher realized that, if this information were disclosed to SBA and
> Frontier, they would not join in the Permanent Loan, placing Pinnacle's
> Construction Financing mortgage at substantial risk of default.

40.     Schumacher then embarked on a plan to protect the Bank's position and reap financial benefit at the expense of SBA/Frontier. One part of this plan consisted of Pinnacle's delaying the conversion to the Permanent Loan as long as possible to continue to capture higher interest rates. This delay allowed Pinnacle to continue to accrue 7.5% interest on $4.8 million at the Construction Financing rate, rather than 4% on $2.8 million.

41.     This was seen as advantageous to the Bank, not only because the rate was nearly double the rate that the Bank would receive under the Permanent Loan but was accruing on a much larger sum of money, and it also could be used to increase the amount of the debt for which Pinnacle could claim security. As of April 1, 2008, the actual construction costs (exclusive of interest) amounted to $4.56 million. Through continuing to charge interest against the Construction Loan, the Bank could make it appear that the entire $4.8 million had been used up and the Bank could claim security for that amount. Additionally, the final construction costs could then be charged against Mr. Tilden's HELOC which was secured by separate property. The Bank could maximize its financial return from the loan program while shifting all risk of loss onto SBA.

42.     The plan that developed was that, when the Bank had achieved the maximum amount of asset security that could be obtained in the Hotel property and in Mr. Tilden's

14

personal residence, it would proceed with the conversion to the Permanent Loan in which it would receive $1.945 million from SBA/Frontier but leaving Tilden and Columbine liable.

43.     Because Columbine and Mr. Tilden believed that the interest on the Construction Financing was to be rolled over, they were unaware that the Bank was depleting their credit resources. They believed that the accruing interest on the Construction Loan was to be rolled over into the Permanent Loan as an unsecured additional loan amount. It was reasonable for them to believe this because:

> a. Schumacher had repeatedly made verbal representations to Tilden that interest would not be collected during the construction phase and that the accrued amounts of construction interest would be rolled over into an unsecured loan as part of the Construction Loan.

> b. The estimated construction costs which were the basis for the Construction Financing were established at $5.6 million exclusive of interest. The Bank's proposal to fund $4.8 million in construction costs in addition to Tilden's and Columbine's contribution of $850,000 in personal equity contributions exhausted the available credit resources without accounting for the interest payments during the construction phase.

> c. The Commitment Letter stated that the interest on the Construction Loan would be rolled into the Permanent Loan at closing. This significant feature of The Commitment Letter specifically stated:

15

> Interest payments monthly on the Construction Loan, calculated on a simple interest basis on the daily outstanding balance for the monthly billing period, along with all principal at maturity to be refinanced into a term loan to be further defined below.

d. Tilden and Columbine had relied upon the written documents and Schumacher's representations from the beginning stages of negotiations.

44. Tilden/Columbine did not then realize nor were they informed that Pinnacle was relying on certain provisions in the related loan documents to arrive at an interpretation contrary to what was stated in the Commitment Letter.

45. SBA/Frontier was likewise totally unaware of the Bank's intentions and actions.

## B. SBA 504 Loan Closing and Pinnacle's Failure to Convert the Construction Loan to the Permanent Loan

46. In February of 2008, the SBA/Frontier knew that the AmericInn had been substantially completed months ahead of schedule and that the Hotel was operating. Notwithstanding that the Hotel was open for business, Pinnacle took no action to process and close the Permanent Loan.

47. On April 2, 2008, Frontier finally wrote Pinnacle to specifically request the documentation needed to proceed with closing the Permanent Financing. SBA/Frontier was ready to close the SBA 504 Loan.

48. Being pressed by SBA, Pinnacle then verbally proposed to Columbine/Tilden to close the Permanent Financing in July of 2008. July came and went, however, without Pinnacle taking the required steps to facilitate a closing. Instead, Pinnacle proceeded to delay that closing by claiming that the "equity contribution" documents had been misplaced and needed to be

16

regenerated. The Bank then compiled new documentation. This process delayed the closing per Schumacher's plan and did so needlessly.

49.     By September of 2008, Pinnacle's internal accounting showed that all of the Construction Loan was now completely exhausted by the interim interest charges it was applying against the loan. Likewise, by October of 2008, Pinnacle's internal accounting showed that Tilden's HELOC was likewise completely exhausted.

50.     In October of 2008, Pinnacle knew that Tilden and Columbine had no other financial resources to draw on to operate the Hotel except for the income being generated by the startup of the Hotel and sale of Tilden's personal assets. The Bank also knew that economic conditions were deteriorating such that it would be months before the new Hotel would be able to generate sufficient income to meet all of its obligations out of revenue. The Bank knew throughout that Tilden and Columbine would be able to continue operations only with credit and knew that no further credit would be available unless Pinnacle chose to extend it.

51.     In conversations on or about October 25, 2008, Schumacher told Tilden what he thought the permanent interest rate should be under the loan agreements. The rate stated by Schumacher to Tilden was approximately two percentage points higher than the indexed rate that Columbine was entitled to utilize under the loan agreements. Tilden communicated his decision that the Bank should use the interest calculation which produced a significantly lower interest rate. Schumacher represented to Tilden that he would correct that interest rate reference in the note and that the conversion to Permanent Financing would proceed.

17

52.     Finally, in November, Pinnacle determined that it was now time to close the Permanent Financing so that it could obtain the $1.945 million from SBA/Frontier before Pinnacle took action to declare default.

53.     On information and belief, as of November 1, Pinnacle knew that if it obtained the 504 loan and then declared default under the Note, such action would result in SBA/Frontier being unable to recover most, if not all, of the $1.945 million from the AmericInn.

54.     Schumacher informed SBA/Frontier and Tilden that the Bank was finally ready to convert the Construction Loan to the Permanent Financing, and that it would then close on the SBA Guaranteed Debenture. The closing was scheduled for November 5, 2008.

55.     The mortgage documents which Pinnacle prepared on or about November 5, 2008, consisted of, *inter alia*, a promissory note and revised mortgage document ("Mortgage Modification"). The Mortgage Modification stated that it "secures promissory Note #6080009946, in the original amount of $2,797,500," and incorporated by reference the terms of the "Loan Commitment Letter" (hereinafter the "Note"). This sum represented the maximum loan amount permitted to Pinnacle under the December 5, 2006, SBA Authorization.

56.     On November 5, 2008, Tilden appeared at Pinnacle's offices to sign the Mortgage Modification. Pinnacle stated that execution of the Mortgage Modification was required in order to convert the Construction Loan to the Permanent Loan.

57.     When Tilden was presented with the Mortgage Modification, he signed it. Even though a promissory note had been prepared, Mr. Schumacher did not present the note to Mr. Tilden for signature. Mr. Tilden never signed a note for Note #6080009946, (i.e., the Note which

18

the Mortgage Modification purported to secure). In fact, Schumacher and Pinnacle had no intention of finalizing the Permanent Financing because they believed that, on November 5, 2008, Tilden and Columbine were already in default under the Construction Loan. Even though they believed Columbine and Tilden were in default of the Construction Loan, they did not tell Mr. Tilden or SBA/Frontier. They knew that fact could not be disclosed until Pinnacle had obtained the $1.945 million payment from closure of the SBA 504 Loan.

58.     Tilden signed the Mortgage Modification because Pinnacle stated that the document was needed in order to convert the Construction Loan to the Permanent Loan.

59.     Although the unsigned Note was never provided to Tilden, and Tilden was not told that it was being sent by Pinnacle to SBA/Frontier, Schumacher nonetheless included a copy of the unsigned note along with other documents sent to SBA/Frontier to signify to SBA/Frontier that the Permanent Financing was complete. Schumacher knew at the time of transmitting the documents to SBA that Tilden was never presented, and never signed, the Note which the Mortgage Modification purportedly secured. The copy which Schumacher supplied Frontier and SBA was printed with the watermark "Copy." This deceptive act gave the appearance that Tilden and Columbine had actually executed the Promissory Note and the "Copy" had been delivered to Frontier and SBA to represent that the execution had occurred when in fact it had not occurred and would not occur. During several discussions before and after Tilden signed the Mortgage Modification, Schumacher reconfirmed that the Construction Loan would be converted to the Permanent Loan and the interest from the Construction Loan would be rolled into the Permanent Financing.

60.     On November 5, 2008, as part of the SBA 504 Loan closing, Pinnacle executed

and sent to SBA/Frontier the Interim Lender Certification form required under the December 5,

2006, "Authorization." In the Interim Lender Certification, Schumacher, on behalf of the Bank,

certified that (1) it has no knowledge of any unremedied substantial adverse change in

Columbine's financial condition since the date of the application for the SBA 504 Loan; (2)

Columbine was current on its payments to Pinnacle and not otherwise in default of the loan; and

(3) Pinnacle has disclosed to the SBA/CDC all material information known to it and necessary to

ensure that this the Interim Lender Certification is not misleading. Among other provisions,

Pinnacle specifically represented that

> . . . Interim Lender acknowledges that CDC will rely upon this Interim Lender
> Certification in making the 504 Loan and that SBA will rely upon this Interim
> Lender Certification in guaranteeing the debenture.

Interim Lender certifies, to the best of its knowledge, information and belief, that:

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...
>
> 5. Project costs overruns, if any, have been paid by Borrower with cash,
> representing additional injection of equity; or the proceeds of a separate
> note secured by additional collateral which is not a part of the Interim
> Loan; or by other source described here: None
>
> 6. Interim Lender has no knowledge of any unremedied substantial
> adverse change in the condition of Borrower and Operating Company (if
> any) since the date of loan application to Interim Lender. Borrower is
> current on its payments to Interim Lender and not otherwise in default of
> the Interim Loan.

61.     Also on November 5, 2008, Pinnacle executed a Third Party Lender Agreement

required by SBA which it recorded in the public records with the Clerk and Recorder of Albany

County, Wyoming. In this document, executed for Pinnacle by Schumacher, was the following

representation:

> Accurate Information: The Third Party Lender warrants and represents that all
> information provided to CDC, including, without limitation, all information
> regarding the Borrower's financial condition, is accurate to the best of its
> knowledge and that Third Party Lender has not withheld any material
> information. Third Party Lender acknowledges that for purpose of this
> transaction,· CDC is acting on behalf of the SBA, an agency in the United states
> Government. except that SBA accepts no liability or responsibility for any
> wrongful act or omission by CDC. Third Party Lender further acknowledges that
> any false statements to CDC can be considered a false statement to the SBA, and
> that CDC and the SBA are relying upon the information submitted by the Third
> Party Lender.

62.     Frontier, relied upon the certification from Pinnacle, and believed that Pinnacle

had complied with its contractual commitments to enter into the Permanent Financing for

Columbine. Frontier then executed the CDC Certification on November 5, 2008, certifying that

there had been no unremedied substantial adverse change in Columbine's financial condition

since the date of its application for the SBA 504 Loan.

63.     On or about December 16, 2008, relying on the certifications and representations

Pinnacle made or caused to be made in various documents including, the Interim Lender

Agreement, the Third Party Lender Agreement, the CDC Certification, , the SBA closed the SBA

504 Loan and paid $1.945 million to Pinnacle.

64.     Columbine continued to operate the Hotel but the revenues were not yet sufficient

to cover all payments. On or about June 11, 2009, Pinnacle informed Mr. Tilden that there was

no further credit available for him or Columbine.

65.     Finally, in February, 2010, Tilden and Columbine both filed for bankruptcy. *In re: Samuel Jones Tilden*, Case No. 10-20160 (Ch. 11) (Bnkr. Wy. February 23, 2010); *In re: The Columbine Group, LLC*, Case No. 10-20133 (Bnkr. Wy. February 23, 2010).

66.     On or about June 20, 2010, Pinnacle filed notice of claim in both proceedings. Neither proof of claim mentioned the conversion to Permanent Financing although the claims apparently did reflect a reduction in the debt resulting from the payment from SBA. Large sums of interest were claimed without an explanation as to calculation of amounts or rates.

67.     Tilden and Columbine spent several months requesting information and details from Pinnacle. Finally, in a letter dated March 25, 2011, Pinnacle stated that Columbine/Tilden had been in default prior to November 5, 2008, confirming that position by saying:

A new Note was never booked by Pinnacle because Columbine had failed to comply with the terms of the existing note, namely the requirement of regular interest payments.

68.     Several weeks later in April of 2011, during a meeting with SBA attorney Lobdell and Frontier attorney Michael Lansing, Mr. Lansing produced the unsigned Note "Copy" and showed it to Tilden. He informed Tilden it was the SBA/Frontier's understanding that, based upon the "Copy", the Construction Loan had been duly converted to the Permanent Loan by Pinnacle in compliance with the Authorization and the requirements specified in the preceding paragraphs.

69.     The absence of a duly executed note was then presented to Pinnacle with a request for an explanation. Again, in its attorney's letter dated May 19, 2011, Pinnacle reiterated that a

new note and new loan were "not booked" because Pinnacle believed Columbine was already in default for failing to pay interest.

70.     By delaying the SBA 504 closing and failing to convert to the Permanent Loan, and by waiting until after the SBA 504 Loan closed to claim Columbine was in default, Pinnacle was able to collect the proceeds from the SBA 504 Loan and extract as much money out of Columbine as it could before it declared Columbine in default, resulting in the bankruptcy proceedings. Had the SBA 504 Loan been closed and the Construction Loan been converted to the Permanent Loan in April/July 2008, Columbine would have been paying a significantly lower interest rate of 4.01% on the $2.8 million Permanent Loan. Instead of converting and paying the lower interest rate, however, the Bank forced Columbine to pay 7.5% on the $4.8 million Construction Loan. Overall, the delay allowed Pinnacle to collect an additional $156,000 in interest from April through November.

## FIRST CAUSE OF ACTION

### (False Claims Act: Presentation of False Claims)

71.     The United States repeats and realleges each allegation in paragraphs 1 through 72 as if fully set forth herein.

72.     Pinnacle Bank knowingly presented or caused to be presented a false or fraudulent claim or claims for payment or approval to an officer, employee or agent of the United States, in violation of 31 U.S.C. § 3729(a)(1).

73.     Prior to the SBA 504 Loan closing, Pinnacle made the following certifications to the SBA:

23

a. Pinnacle executed the Interim Lender Certification certifying that (1) it had no knowledge of any unremedied substantial adverse change in Columbine's financial condition since the date of the application for the SBA 504 Loan; (2) Columbine was current on its payments to Pinnacle and not otherwise in default of the loan; and (3) Pinnacle had disclosed to the SBA/CDC all material information known to it and necessary to ensure that this the Interim Lender Certification was not misleading.

b. Pinnacle executed a Third Party Lender Agreement certifying that all the information that it provided to the SBA/CDC, including all information regarding Columbine's financial condition is accurate and that Pinnacle had not withheld any material information.

c. Frontier, relying on information from Pinnacle, executed the CDC Certification, certifying that there had been no unremedied substantial adverse change in Columbine's financial condition since the date of the application for the SBA 504 Loan.

74.    Relying on these representations and certifications, the SBA transmitted $1,945,000 ($2,000,000 less administrative costs) to Pinnacle.

75.    The representations and certifications that Pinnacle made and/or caused to be made to the SBA were false because, according to Pinnacle, Columbine was in default of its Construction Loan, and Pinnacle did not convert and did not intend to convert the Construction

Loan into the Permanent Loan. Accordingly, although Pinnacle certified to the SBA/CDC otherwise:

      a.  Pinnacle had knowledge of what it believed to be unremedied substantial adverse changes in Columbine's and Tilden's financial condition;

      b.  Pinnacle believed that Columbine was not current on its payments, lacked the financial resources to continue operations, and/or was otherwise in default sufficient for Pinnacle to take action against the collateral and only waited to do so until after it received the $1.945 million from SBA;

      c.  Pinnacle believed that the security had lost value as a result of the nation's economic downturn; and

      d.  Pinnacle failed to disclose its beliefs and all material information related to the financial condition of Columbine and Tilden to the SBA/CDC.

76.     Thus, Pinnacle caused Frontier to certify that there was no unremedied substantial adverse change in Columbine's financial condition when in fact Pinnacle had surreptitiously created a change in the financial condition without the knowledge of Tilden, Columbine, HMI and/or Frontier.

77.     Pinnacle made and caused to be made false statements and certifications to the SBA to induce the SBA to close the SBA 504 Loan for Pinnacle to collect the SBA 504 Loan proceeds.

78.     The information regarding Columbine's financial circumstances that Pinnacle withheld from, or misrepresented to, HMI/Tilden, Frontier and the SBA was material and had a natural tendency to influence Frontier's decision to close the SBA 504 Loan and the SBA's decision to fund the SBA 504 Loan.

79.     If Frontier and/or the SBA had known the information regarding Columbine's financial circumstances that Pinnacle withheld or misrepresented, the SBA would not have funded the SBA 504 Loan and expended the associated administrative costs.

80.     Pinnacle knowingly presented and/or caused to be presented false claims in the form of false certifications regarding Columbine's financial condition to the SBA for payment or approval by the United States.

81.     By virtue of the false or fraudulent claims that Pinnacle Bank made or caused to be made, the United States is entitled to recover multiple damages and penalties under the False Claims Act.

82.     As direct and proximate result of Pinnacle's false claims, misrepresentations and concealments, the SBA has suffered a financial loss of up to $2 million and is entitled to damages in the amount of the loss.

## SECOND CAUSE OF ACTION
### (False Claims Act: Making or Using False Record or Statement)

83.     The United States repeats and realleges each allegation in paragraphs 1 through 84 as if fully set forth herein.

84.     Pinnacle Bank knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim or claims in violation of 31 U.S.C. § 3729(a)(1)(B).

85.     By virtue of the false records or statements that Pinnacle Bank made or caused to be made, the United States is entitled to recover multiple damages and penalties under the False Claims Act.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that judgment be entered in its favor against Pinnacle Bank under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as required by law, and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Trial by a jury is demanded in this case and the fees therefore will be tendered pursuant to the Rules of Court.

Dated: May 9, 2012.                          Respectfully submitted,

STEPHEN L. SIMONTON, P.C.
Stephen L. Simonton, Esq.
(Wyo. State Bar No.4-1063)
1222-11th Street
Cody, Wyoming 82414-3594
Tel: (307) 587-7010
Fax: (307) 587-2746
Email: simonton@wavecom.net

27

BERGER & MONTAGUE, P.C.
Daniel R. Miller
(PA Bar No. 68141; DE Bar No. 3169)
Shauna B. Itri
(NJ Bar No.044372005; PA Bar No. 201611)
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dmiller@bm.net; sitri@bm.net
(Petition for Pro Hac Vice pending)

*Z:\TILDEN\Qui Tam\Qui Tam Complaint Final 5-8-12.docx*