ORIGINAL

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 OCT 28  PM 4 27

STEPHAN HARRIS, CLERK
CHEYENNE

CHRISTOPHER A. CROFTS
United States Attorney
MARK A. KLAASSEN
C. LEVI MARTIN
Assistant United States Attorneys
District of Wyoming
P. O. Box 668
Cheyenne, WY 82003-0668
Telephone: 307-772-2124
Facsimile: 307-772-2123
mark.klaassen@usdoj.gov
christopher.martin1@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF WYOMING

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **HOSPITALITY MANAGEMENT, INC.,**  )<br>)<br>)<br>      Plaintiff,                                      )<br>)<br>      v.                                                )<br>)<br>**PINNACLE BANCORP INC.**                )<br>**d/b/a PINNACLE BANK,**                    )<br>)<br>      Defendant.                                   ) | Case No. 12CV00095-F |

### UNITED STATES' COMPLAINT IN INTERVENTION

Plaintiff, the United States of America, by and through the United States Attorney and the undersigned Assistant United States Attorneys, files this Complaint in Intervention and alleges as follows:

### INTRODUCTION

1.     The United States intervenes in this *qui tam* action against Defendant Pinnacle Bancorp, Inc. to recover treble damages and civil penalties under the False Claims Act ("False

Claims Act" or FCA), as amended 31 U.S.C. §§ 3729 *et seq.*; the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), 12 U.S.C. § 1833a; and for unjust enrichment.

2.     As detailed more fully below, this action arises from the conduct of Defendant in knowingly withholding material information from, and making material false or fraudulent statements to the United States Small Business Administration regarding the financial condition of a borrower seeking to obtain a loan under the SBA's 504 Loan Program.

## PARTIES

3.     The United States is the plaintiff, and brings this action on behalf of the United States Small Business Administration (SBA), a federal agency.

4.     Defendant, Pinnacle Bancorp, Inc., d/b/a/ Pinnacle Bank ("Pinnacle" or "the Bank"), is a bank holding company with state charters in Nebraska, Wyoming, Texas and Colorado.  Defendant operates a branch located at 1702 Sheridan Avenue, Cody, Wyoming, where a substantial part of the events giving rise to this complaint took place.

5.     The nominal relator, Hospitality Management, Inc. (HMI), is a Wyoming S-Corporation wholly owned by Samuel J. Tilden.

## JURISDICTION AND VENUE

6.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732.

7.     The Court has supplemental jurisdiction to entertain common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over Pinnacle pursuant to 31 U.S.C. § 3732(a), and because it transacts business in this District.

8.      Venue in the District of Wyoming is appropriate pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims described herein occurred in this District.

## BACKGROUND

9.      The SBA's 504 Loan Program, which is authorized by Section 504 of the Small Business Investment Act, as amended, 15 U.S.C. §§ 695-697g, provides small businesses with long-term financing ("504 loans") for projects involving acquisition, lease, and improvement or renovation of major fixed assets. 13 C.F.R. §§120.2(c) & 120.800-120.991.

10.     The small business borrower applies for a 504 loan through a Certified Development Company (CDC), a non-profit corporation the SBA authorizes to originate and close 504 loans in the geographic area where a project will be located.  13 C.F.R. § 120.801(a).

11.     If the SBA approves the borrower's loan application, it issues an authorization agreeing to guarantee (with the full faith and credit of the United States) a debenture that, at the time of closing on permanent financing, will be pooled with other debentures and sold to investors to provide funding for the 504 loan – so long as certain conditions are met. 13 C.F.R. § 120.801(d).

12.     Projects financed through the 504 Loan Program usually require an interim loan from a private lender to cover construction, lease, or acquisition costs during the period between the SBA's authorization and closing on the permanent financing.  The interim loan is often provided by the same private sector lender (Third Party Lender) who will be providing a portion of the permanent financing.  13 C.F.R. § 120.801(b).

13.     Once the project is complete, and all the requirements and conditions of the SBA authorization are met, the CDC arranges for the parties to close on permanent financing.  At that time, the SBA requires the interim lender to certify that since the date of application, there has been no "unremedied substantial adverse change" in the borrower's financial condition.  13 C.F.R. §120.892.  The SBA further requires that the Third Party Lender agree to provide accurate information regarding the Borrower's financial condition and certify it has not withheld any material information.

14.     The SBA relies on these certifications and agreements in evaluating whether to give final loan approval and close the guaranteed debenture.  If the interim or Third Party Lender fails to disclose or misrepresents a material fact to the SBA regarding the project or the 504 loan, the SBA may, within its sole discretion, decline to close the debenture or cancel its guarantee of the debenture prior to sale.  13 C.F.R. § 120.960.

15.     If the SBA gives final loan approval, the CDC closes the 504 loan and issues the SBA-guaranteed debenture.  The debenture proceeds (less administrative costs) are transferred to the interim lender to pay off the interim loan.

16.     Upon closing, the permanent financing for the project consists of: (1) a contribution from the small business of at least 10 percent of the project costs; (2) a 504 loan made by the CDC with proceeds from the sale of SBA-guaranteed debenture, covering up to 40 percent of the project costs and certain administrative costs, which is collateralized by a second lien on the project property; and (3) a Third Party Loan from a private sector lender ("Third

4

Party Lender") covering the remainder of the project costs (approximately 50 percent), which is collateralized by a first lien on the project property. 13 C.F.R. § 120.801(c), §120.900.

17.     The 504 Loan Program is advantageous to Third Party Lenders because it allows them to participate in loan transactions that transfer substantially all the risk of default to the SBA. When a 504 loan closes, the SBA pays off a portion of the interim financing in exchange for a second lien on the project property, subordinating its interest to the Third Party Lender. In the event of default, the Third Party Lender may recover its investment by foreclosing on its priority security interest in the collateral.

STATEMENT OF FACTS

18.     On or about May 1, 2006, Samuel Tilden applied to Pinnacle on behalf of his wholly-owned limited liability company, the Columbine Group, LLC ("Columbine"), for a loan to build an AmericInn Lodge and Suites ("AmericInn" or "the hotel") in Laramie, Wyoming.

19.     Upon receiving this request, Pinnacle and Tilden agreed that the hotel project was ideally suited for a 504 loan and that they would work cooperatively to get such financing approved and closed.

20.     Pinnacle Senior Vice-President, Michael Schumacher, was the Bank employee primarily involved in the loan transaction with Tilden. At all relevant times, Schumacher acted within the scope and course of his employment with Pinnacle, and was authorized to act on behalf of the Bank in taking the actions and making the commitments outlined in this Complaint.

21.     On or about June 21, 2006, Schumacher provided Tilden with a revised initial Loan Proposal Letter of Terms and Conditions agreeing that Pinnacle would provide Columbine

with both interim financing (also referred to as the "Construction Loan") and a portion of the

permanent financing (also referred to as the "Third Party Loan") for the hotel project, subject to

SBA approvals.

22.     Schumacher assisted Tilden in submitting a 504 loan application to the SBA

through Frontier Certified Development Company ("Frontier CDC"), a company authorized to

provide 504 loan program services in Wyoming.

23.     On December 5, 2006, SBA approved Columbine's 504 loan application and

issued an Authorization for Debenture Guarantee ("Authorization") for SBA Loan #25641060-

09. Under the terms of the Authorization, the SBA conditionally agreed to provide a guaranteed

20-year debenture in the amount of $2,000,000.00, from which it would pay Pinnacle

$1,945,000.00 ("Net Debenture Proceeds") for reimbursement of the interim loan after deducting

administrative costs.  The SBA would receive a $2,000,000.00 second mortgage on the

AmericInn.

24.     The Authorization specified a total project cost of $5,585,575.00, and identified

Pinnacle as: (1) the "Interim Lender" who would provide an interim loan in the amount of

$1,945,000.00, to be paid off using the Net Debenture Proceeds; and (2) the "Third Party

Lender" who would provide a portion of the permanent project financing in the amount of

$2,797,500.00.  A true and correct copy of the Authorization is attached as Exhibit A.

25.     After receiving the Authorization, Tilden worked with construction contractors to

finalize bids for the AmericInn project.  The final construction costs were higher than the

estimates presented to the SBA in the 504 loan application and approved in the Authorization,

but Pinnacle nevertheless agreed with Tilden to move forward on the hotel project.

26.     Pinnacle sent Tilden a Final Loan Commitment Letter of Terms and Conditions

("Loan Commitment Letter") on April 19, 2007, confirming the proposed loan structure and

pricing, including the increased total project cost of $5,646,723.00.  A true and correct copy of

the Loan Commitment Letter is attached as Exhibit B.

27.     In the Loan Commitment Letter, Pinnacle agreed to fund the interim Construction

Loan of approximately $4,800,000.00, or 85% of the total project cost, and permanent Third

Party Loan of approximately $2,800,000.00.  The Loan Commitment Letter also noted that

Frontier CDC required a 10% contingency reserve of construction costs.  Pinnacle agreed to

provide this reserve through a home equity line of credit (HELOC) for Columbine of up to

$500,000, to be secured by Tilden's personal residence.  Pinnacle also "acknowledge[d] the

ample equity margin available in personal residence beyond the $500,000 committed," and stated

it "… would favorably consider an increase if necessary to fund a shortfall in that event."

28.     On April 20, 2007, Tilden (on behalf of himself and Columbine) and Schumacher

(on behalf of Pinnacle) signed documents implementing the terms of the Loan Commitment

Letter, including promissory notes and mortgages for the Construction Loan (Note

#6050009451) and HELOC (Note #6050009450), and Tilden's personal guarantee of

Columbine's debts to Pinnacle.

29.     With interim financing in place, Columbine proceeded with construction of the

AmericInn beginning in the spring of 2007.  The hotel was substantially completed in January

7

2008. A temporary certificate of occupancy was issued to Columbine on February 8, 2008, and the hotel opened for business later that same month.

30.     On April 2, 2008, Frontier CDC, through its designated attorney, requested that Pinnacle provide documentation needed to proceed with closing on the permanent financing. Frontier CDC did not receive all of the necessary information until approximately six months later, which delayed closing on the permanent financing.

31.     As of April 4, 2008, Columbine had fully expended the $4,800,000 Construction Loan, but not all invoices for final construction costs had been received and paid at that time. Columbine had to rely on other sources of financing to pay the project cost overruns, including the available balance of the HELOC.

32.     During the construction phase, until the Construction Loan had been fully expended, Pinnacle deducted monthly interest payments on the outstanding balance from the available balance of the Construction Loan itself. Once the Construction Loan was fully expended, an unpaid interest balance began to accrue.

33.     In July 2008, with the available balance of the HELOC dwindling and unpaid interest charges accruing on the HELOC and the Construction Loan, Schumacher contacted Tilden and notified him that something needed to be done to bring the construction loans current before the end of the month.

34.     On July 31, 2008, Tilden arranged with Pinnacle for Columbine to borrow another $125,037 in the form of a "Working Capital Loan." This loan was initially secured by a mortgage on the hotel that Pinnacle later released at the time of closing on permanent financing.

8

35.     By September 10, 2008, Columbine had fully expended the $500,000 HELOC. Pinnacle extended no further home equity credit to Tilden or Columbine after this date.

36.     In October 2008, Frontier CDC finally received the remaining information needed to close on the permanent financing, including invoices and proof of payments verifying the owner's equity injection for the project.

37.     Closing on permanent financing for the hotel project took place on November 5, 2008. On that date, Schumacher, on behalf of Pinnacle, completed and signed: (1) an Interim Lender Certification; and (2) a Third Party Lender Agreement, both of which contained material false or fraudulent statements or omissions regarding the financial condition of the borrower and conversion of the interim loan to permanent financing, as detailed more fully below.   True and correct copies of these agreements are attached as Exhibits C and D.

38.     On that same date, Pinnacle and Tilden executed a mortgage modification securing a new promissory note (Note #6080009946), in the original amount of $2,797,500, which was the Third Party Loan amount specified in the Authorization.   However, the Bank did not present Note #6080009946 for Tilden to sign at closing or at any time thereafter.   Pinnacle nevertheless included an unsigned copy of Note #6080009946 in the closing documents provided to Frontier CDC and the SBA.

39.     On or about November 26, 2008, before the SBA had given final loan approval and closed the debenture funding the 504 loan, Tilden signed a commercial debt modification agreement with Pinnacle extending the maturity date of the Construction Loan (Note #6050009451), the HELOC (Note #6050009450), and the Working Capital Loan (Note

#6070009919) until January 1, 2009, and changing the terms of the Construction Loan and HELOC to defer interest (which had been accruing and was payable monthly) so that it would be due in full at maturity.

40.     Relying on the Pinnacle's certifications that permanent loan closing documents had been executed and that Columbine was current on the Construction Loan, and unaware of the working capital loan, the debt modification agreement to defer interest payments, and other material financial information relevant to the financial condition of Columbine, the SBA gave final approval for the 504 loan, issued the debenture guarantee, and facilitated payment of Net Debenture Proceeds to Pinnacle on or about December 17, 2008.

41.     Pinnacle credited the Net Debenture Proceeds of $1,945,000.00 against its Construction Loan to Columbine, reducing the balance to $2,855,000.  However, unbeknownst to Frontier CDC or the SBA, Pinnacle did not convert the remaining balance to a permanent Third Party Loan as provided in the Authorization.  The remaining loan exceeded the amount specified for the Third Party Loan in the Authorization, continued to accrue interest at the higher rate applicable to the Construction Loan, and was due in full at the maturity date of January 1, 2009.

42.     Columbine made no payments to Pinnacle to bring the remaining balance of the Construction Loan, HELOC, or Working Capital Loan current on their maturity date of January 1, 2009; nor did Columbine make any monthly payments to Pinnacle on these loans during 2009.

43.     Columbine continued to operate the hotel, but occupancy rates did not improve as expected and revenues were insufficient to cover expenses and service its debt.  Columbine made

some monthly payments on the 504 loan in 2009, but Tilden requested several deferrals from the SBA during the course of the year.

44.     In a letter dated June 11, 2009, Pinnacle formally notified Tilden that it would extend no further credit or forbearance to him or Columbine, and that he was 161 days past due on his Construction Loan, HELOC, and Working Capital Loan.

45.     On or about December 28, 2009, Pinnacle issued a foreclosure notice stating Columbine had made no payments since January 2009, and that as of December 21, 2009, the total amount due and owing on the Construction Loan was $3,107,843.48, which represented the entire unpaid principal balance of $2,855,000.00, plus accrued but unpaid interest from September 16, 2008, to December 21, 2009, in the amount of $252,843.48.

46.     In a letter dated January 21, 2010, Frontier CDC notified Tilden that as a result of Pinnacle's foreclosure, the SBA was compelled to repurchase the debenture funding the 504 loan as required by its guarantee. On or about February 1, 2010, the SBA repurchased the debenture at a cost of $1,977,153.65.

47.     On February 23, 2010, just before the scheduled foreclosure sale of the hotel, Tilden and Columbine filed for bankruptcy in cases captioned *In re: Samuel Jones Tilden*, Case No. 10-20160 (Ch. 11) (Bankr. Wyo. February 23, 2010) and *In re: The Columbine Group, LLC*, Case No. 10-20133 (Ch. 11) (Bankr. Wyo. February 23, 2010).

48.     Pinnacle filed notices of claim in both bankruptcy proceedings for the remaining balance of its Construction Loan and HELOC. Pinnacle continued to use the 7.5% interest rate applicable to the Construction Loan to calculate its claims, despite having committed to convert

  
to a permanent loan with a lower indexed rate. Tilden requested information from Pinnacle to understand why the Bank was continuing to apply the higher interest rate.

49.     In a letter dated March 25, 2011, Pinnacle responded that it was claiming the higher Construction Loan interest rate, and had never converted the Construction Loan to a permanent Third Party Loan because "…Columbine had failed to comply with the terms of the existing note, namely the requirement of regular interest payments."

50.     Upon receiving this response, Tilden reviewed the loan file and discovered that Note #6080009946, a copy of which had been provided to Frontier CDC and the SBA as part of the permanent loan closing documentation on November 5, 2008, and purported to reflect the conversion of the Construction Loan to the permanent Third Party Loan, had never been executed.

51.     Tilden then asked Pinnacle to explain why the new note had not been presented for his signature. In a letter dated May 19, 2011, Pinnacle reiterated that a new note and new loan were "not executed on the closing date because of Mr. Tilden's failure to pay interest as required."

52.     The SBA also filed timely proofs of claim in the Tilden and Columbine bankruptcy cases, asserting secured claims for $1,977,153.65, the amount it was required to pay to repurchase the debenture and assume the 504 loan pursuant to its guaranty.

53.     Due to a large decline in the appraised value of the hotel, the SBA's claims in both cases were found to be unsecured and it was relegated to a fractional share of payments to unsecured creditors under confirmed plans of reorganization entered on December 21, 2011.

**A.      Pinnacle Knowingly Made False or Fraudulent Statements and/or Omitted Material Information from Required Disclosures**

54.     Prior to the SBA approving the 504 loan and issuing the guaranteed debenture funding the loan, Pinnacle knowingly made several material false or fraudulent statements to the SBA or failed to provide material information as required.

***1.   Pinnacle Falsely Certified that Columbine was Current and Not Otherwise In Default of the Interim Loan***

55.     In paragraph 6 of the Interim Lender Certification, signed by Schumacher on behalf of Pinnacle on November 5, 2008, the Bank certified to the SBA that:

*[Columbine] is current on its payments to [Pinnacle] and not otherwise in default of the Interim Loan.*

56.     On that date, Pinnacle knew or reasonably should have known that this statement was false or fraudulent, and that Columbine was not current on the Construction Loan (or the HELOC) because interest on those notes was unpaid and past due.

57.     By no later than October 2008, Pinnacle's accounting system was generating past due notices and second notices addressed to Columbine demanding payment and providing the balance of unpaid interest on its Construction Loan and HELOC.  One such notice was dated November 4, 2008, the day before Pinnacle executed the Interim Lender Certification stating Columbine was current on its payments.

58.     The foreclosure notice issued by Pinnacle on or about December 28, 2009, states that interest was accruing but was unpaid as of September 16, 2008, indicating Pinnacle knew or reasonably should have known Columbine was not current on the Construction Loan well before November 5, 2008, the date the Bank signed the Interim Lender Certification stating otherwise.

13

59.     In a letter dated March 25, 2011, Pinnacle admitted it had never converted the

Construction Loan to a permanent Third Party Loan at closing because it knew at that time

"...Columbine had failed to comply with the terms of the existing note, namely the requirement

of regular interest payments."

60.     In a letter dated May 19, 2011, Pinnacle again confessed that a new note and new

loan were "not executed on the closing date because of Mr. Tilden's failure to pay interest as

required."

### 2. *Pinnacle Falsely Certified to the SBA that No Additional Financing had been Provided to Columbine*

61.     In paragraph 5 of the Interim Lender Certification, signed by Schumacher on

behalf of Pinnacle on November 5, 2008, the Bank certified that:

> *Project costs overruns, if any, have been paid by Borrower with cash representing additional injection of equity; or the proceeds of a separate note secured by additional collateral which is not a part of the Interim Loan; or by other source described here: None.* (emphasis in original).

62.     At the time it made this certification, Pinnacle knew or reasonably should have

known this statement was false or fraudulent, and that on or about July 31, 2008, the Bank had

made a Working Capital Loan to Columbine in the amount of $125,037 that was used, in part, to

cover cost overruns on the project, including interest payments on the Construction Loan and

HELOC.

63.     The Working Capital Loan was not "a separate note secured by additional

collateral which [was] not part of the Interim Loan," so Pinnacle had an obligation to disclose the

loan to Frontier CDC and the SBA as an "other source" for paying project cost overruns.

64.     Columbine had fully expended the Working Capital Loan, and Pinnacle's records

reflect that the entire balance was unpaid as of the closing date when the Bank signed the Interim

Lender Certification.

### 3. Pinnacle Falsely Certified that It had Not Withheld Material Information and Had No Knowledge of Unremedied Substantial Adverse Changes in the Financial Condition of Columbine and Tilden

65.     In paragraph 6 of the Interim Lender Certification, signed by Schumacher on

behalf of Pinnacle on November 5, 2008, the Bank certified to the SBA that

> *[it] has no knowledge of any unremedied substantial adverse change in the financial condition of [Columbine] ... since the date of its loan application to [Pinnacle].*

66.     In addition, the Third Party Lender Agreement signed by Schumacher on behalf

of Pinnacle on November 5, 2008, states

> *"that all information provided to CDC, including, without limitation, all information regarding the Borrower's financial condition, is **accurate to the best of its knowledge and that Third Party Lender has not withheld any material information."*** (emphasis added).

67.     On the date it signed the Interim Lender Certification and Third Party Lender

Agreement, Pinnacle knew or reasonably should have known, but did not disclose to Frontier

CDC or the SBA, that Columbine and its principal Tilden had experienced substantial adverse

changes to their financial conditions since applying with Pinnacle for a loan in 2006, including

but not limited to:

(a)     project costs for the hotel that were higher than what had originally been presented to the SBA at the time of the Authorization;

(b)     Columbine's inability to make monthly interest payments on the Construction Loan and HELOC as required under the terms of the notes;

(c)     the need for Columbine to borrow another $125,037 from Pinnacle to pay cost overruns, operating expenses, and past due interest on the Construction Loan and HELOC;

(d)     Columbine's inability to obtain further credit, including Pinnacle's decision not to extend further home equity credit;

(e)     Tilden's personal liquidity problems (due in part to an ongoing and contentious divorce) and inability to sell property or locate a lender willing to extend him additional credit secured by his assets; and

(f)     repeated and unresolved overdrafts on Columbine's accounts with Pinnacle and Tilden's other business accounts.

### 4. *Pinnacle Falsely Stated and Misled the SBA to Believe It Had Converted the Construction Loan to a Permanent Third Party Loan in the Amount Specified in the Authorization*

68.     Under the terms of the Third Party Lender Agreement signed by Schumacher on behalf of Pinnacle on November 5, 2008, the Bank promised to provide a Third Party Loan under terms prescribed in the Authorization, and that such Third Party Loan would not exceed $2,797,500.00. The Interim Lender Certification Schumacher signed on behalf of Pinnacle also confirms the Bank's agreement to reduce the principal balance of Interim Lender's debt to an amount not to exceed the amount of the Third Party Lender Loan specified in the Authorization.

69.     The mortgage documents Pinnacle prepared for closing on November 5, 2008, included a new promissory note (Note #6080009946) and mortgage modification implementing the terms of the permanent financing. The mortgage modification stated that it secured Note #6080009946 in the original amount of $2,797,500, as specified under the Authorization. Tilden signed the mortgage modification, which Pinnacle later recorded, but was not presented with and never signed Note #6080009946.

16

70.     Even though Tilden had not signed Note #6080009946, Pinnacle sent a copy along with other closing documents to Frontier CDC, giving the false and misleading impression that the permanent financing was in place and all conditions were met for the SBA to approve the 504 loan and guarantee the debenture.  Pinnacle knew or reasonably should have known, but did not disclose to the SBA or Frontier CDC, that the new note for the permanent Third Party Loan (Note #6080009946) had not been executed.

73.     On or about December 17, 2008, when the 504 loan proceeds were sent to the Bank, Pinnacle also knew or reasonably should have known, but did not disclose to the SBA or Frontier CDC that the Bank had not reduced the loan balance to the amount specified in the Authorization for the Third Party Loan.

74.     Pinnacle later admitted to Tilden and the SBA during the course of the Tilden and Columbine bankruptcy cases that it had not converted the Construction Loan to a permanent Third Party Loan because Tilden and Columbine were not current (had not paid interest as it came due) on the Construction Loan.

75.     By misleading Frontier CDC and the SBA to believe that the repayment and interest terms of the Third Party Loan were in place, and that the balance of the new note would be the amount specified in the Authorization, Pinnacle was able to receive the 504 loan proceeds without actually converting to permanent financing.  This allowed the Bank to maintain a loan balance that exceeded the amount permitted under the Authorization and continue to charge the higher Construction Loan interest rate, as well as place Columbine at risk of default if it could

not bring the loan current by the maturity date of January 1, 2009 - a mere 15 days after the SBA had funded the 504 loan.

76.     These false statements and fraudulent actions not only masked the fact that specific conditions required for 504 loan approval and debenture authorization had not been met – causing the SBA to approve the loan, guarantee the debenture, and pay loan proceeds to Pinnacle when it otherwise would not have done so – but also increased Pinnacle's secured interest (and ultimately its claim in bankruptcy) in the hotel property beyond what it should have been under the terms of the Authorization, to the financial detriment of the SBA.

### 5. *Pinnacle Failed to Disclose Material Adverse Changes to the Financial Condition of Columbine After the Bank Signed the Closing Documents but Before the SBA Approved the 504 Loan and Guaranteed the Debenture*

77.     Approximately forty-two days elapsed from the date of closing on permanent financing on November 5, 2008, until December 17, 2008, when the SBA funded the 504 loan with proceeds from the sale of the guaranteed debenture. During this period, several events transpired that show Pinnacle knew or reasonably should have known the statements, certifications, and omissions it made in the closing documents were false or fraudulent, and that it needed to revise and update these earlier representations to avoid misleading the SBA.

78.     First, on November 24, 2008, after signing the closing documents but before the SBA gave final loan approval and closed the guaranteed debenture, Pinnacle made a further advance on the Working Capital Loan of $8,781.14 (in addition to the $125,037.00 already outstanding) in order for Columbine to pay property taxes due on the hotel.

79.    The inability of Columbine to make this property tax payment without an additional loan from Pinnacle reflects a further substantial adverse change in the borrower's financial condition that could reasonably be expected to affect Frontier CDC and the SBA's evaluation of the 504 loan. Although it had time to do so before the SBA approved the 504 loan and closed the debenture, Pinnacle did not disclose this additional extension of credit to Frontier CDC or the SBA.

80.    Second, on or about November 26, 2008, after signing the closing documents but before the SBA gave its final loan approval and closed the debenture, Columbine and Pinnacle signed modifications of the Construction Loan and HELOC to extend the maturity date on the notes until January 1, 2009, and make interest due at maturity.

81.    Pinnacle and Columbine had previously modified the Construction Loan and HELOC, but only to extend the maturity dates to accommodate the delay in closing on the permanent financing. The final change to the notes included the deferral of interest payments, which the original notes had required to be paid monthly on outstanding balances.

82.    Pinnacle agreed to make this change because it knew Columbine was not current on its interest payments and could not pay the interest as it came due. Failure to pay interest as it came due on the Construction Loan and HELOC was an event of default under both notes.

83.    Changing the terms of the notes to accommodate Columbine's inability to pay interest and avoid default reflects Pinnacle's knowledge at that time of a substantial adverse change in the financial condition of the borrower that could reasonably be expected to affect the SBA's evaluation of the 504 loan. Although it had time to do so before the SBA approved the

504 loan and closed the debenture, Pinnacle did not disclose the loan modifications to Frontier CDC or the SBA.

84.     Third, after signing the closing documents but before the SBA granted final loan approval and closed the debenture, Pinnacle had become aware of additional material information regarding the financial condition of Columbine and Tilden.

85.     Frontier CDC recommended final loan approval to the SBA based on a review of the borrower's financial statements that were current as of September 30, 2008.  After that date, Pinnacle became aware of more recent financial information about the continued poor performance of the hotel, as well as knowledge of Tilden's worsening personal financial situation, including his inability to liquidate assets or secure additional financing.  Although it had time to do so before the SBA approved the 504 loan, Pinnacle did not disclose this additional material financial information to Frontier CDC or the SBA.

**B.     The SBA Relied on Pinnacle's False or Fraudulent Statements and Omissions**

86.     When approving the 504 loan and guaranteeing the debenture, the SBA expressly relied upon the completeness and accuracy of the certifications and statements made by Pinnacle in the Interim Lender Certification and the Third Party Lender Agreement, as well as other documentation, information, and assurances provided to Frontier CDC and the SBA as part of the loan transaction.

87.     Pinnacle acknowledged in the Third Party Lender Agreement that Frontier CDC was "acting on behalf of the SBA," and that "any false statements made to Frontier CDC could be considered false statements to the SBA."

88.     Pinnacle acknowledged in the Interim Lender Certification that execution of that completion of the document was "[o]ne of the conditions for the 504 Loan," and that "[Frontier] CDC will rely upon this Interim Lender Certification in making the 504 Loan and that SBA will rely upon this Interim Lender Certification in guaranteeing the debenture."

89.     On November 17, 2008, the designated attorney for Frontier CDC sent a letter to the SBA District Counsel rendering an opinion, in reliance on the accuracy of the closing documents submitted by Pinnacle, that all required contracts were in place and closing on the 504 loan could proceed.

90.     In rendering this opinion to the SBA, the designated attorney for Frontier CDC expressly stated that it was based on the accuracy and authenticity of copies of various documents, including the notes and mortgage to Pinnacle Bank in the amount of $2,797,500.00, the Interim Lender Certification, and the Third Party Lender Agreement.

### C.     The False or Fraudulent Statements and Omissions are Material

91.     The false or fraudulent statements, certifications and omissions Pinnacle made had a tendency to influence the SBA's decision to give final loan approval and guarantee the debentures funding the 504 loan because they relate directly to essential requirements or conditions that had to be satisfied prior to loan approval, the financial condition and creditworthiness of Columbine, and the risk to be undertaken by the SBA in guaranteeing the debenture.

92.     If the SBA had known that Pinnacle had not converted its interim loan to permanent financing, or been informed of Columbine's default on the interim loan and other

Case 2:12-cv-00095-NDF   Document 27   Filed 10/28/13   Page 22 of 25

adverse financial conditions that Pinnacle either withheld, falsified, or misrepresented, as set

forth in the preceding paragraphs, the SBA would not have approved the 504 loan, guaranteed

the debenture funding the 504 loan, expended the associated administrative costs, or been

required to repurchase the debenture pursuant to its guarantee when the 504 loan became in

default.

93.     In fact, had Pinnacle made complete and truthful disclosures, the most basic

conditions for loan approval would not have been met, and the SBA would have had no

discretion to approve the loan or authorize the sale of the debenture.

**D.      The False or Fraudulent Statements and Omissions Led Directly to the
          Submission of a False Claim Resulting in Damages to the SBA**

94.     By withholding information or providing false or fraudulent information to

Frontier CDC and the SBA, as set forth in the preceding paragraphs, Pinnacle induced the SBA

to issue the guaranteed debenture, make payment to the Bank of $1,945,000.00 in Net Debenture

Proceeds, and participate in the permanent financing for the project as a subordinate lender.

95.      Pinnacle's false and fraudulent statements and omissions, while remaining

inchoate until Columbine's later default, have a direct nexus with the ultimate presentation of the

false claim in this instance, because they involve facts and conditions that were essential to

meeting loan approval requirements and related directly to whether the borrower would be able

to meet loan payments.

96.     The false or fraudulent statements and omissions were the essential conditions

that induced the United States to guarantee the debentures funding the 504 loan, which led

directly to an enforceable demand for money upon the United States.  When Columbine

22

defaulted on the 504 loan, it triggered the debenture guarantee and caused a financial loss to the SBA in repurchasing the debenture in the amount of $1,977,153.65, plus administrative costs and interest.

### FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)

97.     The United States repeats and re-alleges each allegation in the preceding paragraphs as if fully set forth herein.

98.     Pinnacle knowingly presented, or caused to be presented, a false or fraudulent claim or claims for payment or approval to an officer, employee or agent of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

99.     By virtue of the false or fraudulent claims that Pinnacle made or caused to be made, the United States suffered damages and is entitled to recover multiple damages and civil penalties for each violation under the False Claims Act.

### SECOND CAUSE OF ACTION
(False Claims Act: Making or Using False Record or Statement)

100.    The United States repeats and re-alleges each allegation in the preceding paragraphs as if fully set forth herein.

101.    Pinnacle knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim or claims in violation of 31 U.S.C. § 3729 (a)(1)(B).

102.    By virtue of the false records or statements made by Pinnacle, the United States suffered damages and is entitled to recover multiple damages and civil penalties for each violation under the False Claims Act.

### THIRD CAUSE OF ACTION
(FIRREA: Making False Statement to the SBA)

103.    The United States repeats and re-alleges each allegation in the preceding paragraphs as if fully set forth herein.

104.    Pinnacle knowingly made a false statement to the SBA for the purpose of obtaining a loan for an applicant, influencing the action of the SBA, or obtaining something of value in violation of 15 U.S.C. § 645(a).

105.    The false statements made by Pinnacle resulted in a pecuniary loss to the SBA. Under 12 U.S.C. § 1833a(b), Pinnacle is liable for a civil penalty not to exceed either $1.1 million or the amount of the pecuniary loss to the SBA, whichever is greater.

### FOURTH CAUSE OF ACTION
(Unjust Enrichment)

106.    The United States repeats and re-alleges each allegation in the preceding paragraphs as if fully set forth herein.

107.    Because of the acts and omissions of Pinnacle, the SBA guaranteed a debenture funding a 504 loan that allowed Pinnacle to secure a pecuniary benefit (i.e., loan proceeds and the reduced risk of loss in the event of default) which it was not entitled to receive.

108.    Pinnacle has therefore been unjustly enriched and the United States has been damaged.

109.    The United States is entitled to restitution in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that judgment be entered in its favor against Pinnacle as follows:

1.    On the First and Second Causes of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as required by law, and such other and further relief as the Court deems just and proper.

2.    On the Third Cause of Action under FIRREA, for a civil penalty up to the maximum amount allowed under FIRREA, and such other and further relief as the Court deems just and proper.

3.    On the Fourth Cause of Action, for restitution in the amount by which Pinnacle was unjustly enriched, plus interest, costs, and expenses, and such other and further relief as the Court deems just and proper.

Respectfully submitted this _28th_ day of October, 2013.

CHRISTOPHER A. CROFTS
United States Attorney


By:    _Mark Klaassen_
MARK A. KLAASSEN
Assistant United States Attorney

C. LEVI MARTIN
Assistant United States Attorney

25